One thing, we have several cases to be bartered and we are privileged to welcome to the Federal Circuit Judge Ken Jordan, who was formerly a district judge in Delaware, recently elevated to the Third Circuit, and I'm quite pleased to report that today is his first sit-in as a circuit judge, and we are honored to have the benefit of his experience and his perspectives. Welcome, Judge Jordan. Thanks very much. Sorry for you folks. And I would ask counsel today, as everybody, I think, knows, our arguments are recorded and posted on our website, so as you come to the lecture, please enter your appearance and introduce yourself and your firm, your company, if you like, and the party you represent. That way, the record is clear and it also benefits the court in helping pronounce your names correctly. We'll begin with the first case, 2006-1265, Cargill v. Canbra Foods. Mr. Solomon. Excuse me, sir. Excuse me. The video mic will just be all right. It's sufficient. I'm sorry. I didn't know you had them on. Sorry. Good morning. Good morning. I am Alan Sokol. I am here representing Cargill v. Pelham. May it please the court, I'd like to reserve five minutes for rebuttal. And given the time available, I would like to address only the inequitable conduct issue and rely on the briefs for the on-sale issue, unless, of course, the court has any questions. The district court made critical errors in holding that there was inequitable conduct, both on materiality and intent. And although it clearly erroneously found materiality, its most egregious error was with respect to intent to deceive. It based its finding on intent, quote, more than anything else, on the omitted data's high degree of relevance. That's in the appendix at page six. But this court has repeatedly said that intent is a separate element that has to be proven by clear, convincing evidence, and it cannot be inferred simply from materiality. But there was no other meaningful evidence of intent to deceive in this case. On the contrary, after observing Dr. DeBonte's testimony, the trial judge concluded, and I'm quoting, I think it highly likely he omitted the information because he concluded it could be explained away. And that's in the appendix at page seven. He also concluded he wasn't trying to be sneaky and obtain a patent he didn't believe he'd earned. And he wrote still further, Cargill and Dr. DeBonte did believe that IMC 130 was better than IMC 129, and they were right, at least on the evidence before me. I understand the quotes you have, but that wasn't all the district court said, was it? I mean, the district court also said the issue is whether he intended to deceive the PTO about the actual state of the evidence relevant to the application. And the district court did find that he took a shortcut, he did so intentionally, and so that was sufficient to establish the intention to deceive. Your Honor, he did that, but the way he got there was to say that the explanations that Dr. DeBonte gave for believing that the material was not relevant, those explanations were not obvious and non-debatable. And therefore, not only was he not going to consider the explanations with respect to materiality, but not even with respect to intent was he going to consider those explanations. And this court has repeatedly held that the district court has to consider all of the reasons and all of the evidence, including exculpatory evidence, on the issue of intent. And there are numerous cases in this court that have gone through that exercise, even though the explanations were not obvious and were debatable, rather than non-debatable. So you're saying that if someone – if the district court concludes that rationale was that it could have been explained away, even though the material was highly relevant, then the district court cannot find an intent to sneak under those circumstances? Well, I'm saying the court has to at least go through the exercise of considering the explanations and seeing whether they're plausible. If they are plausible, it's not deceptive intent. The court said he wasn't trying to be sneaky. That's inconsistent with the finding of intent to deceive. Well, let me ask you this. Isn't it – is it an unfair interpretation of this record to say that the district court was maybe trying to be a little nice? I agree with what the court said. Not necessarily sneaky, but was expressed in saying that there was an affirmative effort to keep away from the PTL information that would have shown that this new oil was not strengthening the difference. You've quoted a few things, and maybe the better way for me to ask this question is just to have you respond to something your opponents say. They, on page 53 of your answer, I think, say that Dr. DePonte did more than just conceal data. In words of Ken Lyons, he affirmatively argued that the oxidative stability of IMC-130 oil was, quote, knowing that it would help oxidative stability data refute that representation. Isn't that the something – even if we were to accept what you say that it requires something more, isn't that something more? No, Your Honor, it's not something more, because, in fact, IMC-130 is strikingly better in oxidative stability than IMC-129, and the undisclosed data does not refute that. Well, aren't you taking a simple factual argument, then, off of a line in the past? Yes, and there's a clearly erroneous finding in that respect. But with respect to intent, there was a legal effort in not considering the evidence of why there was no inconsistency there. There was no inconsistency because it was an apples-to-oranges comparison. That is, the undisclosed material, which is not prior art, so its only relevance was an inconsistency with the data that was presented. The undisclosed material, as Dr. DePonte testified, he felt was irrelevant for three reasons. One, it was bench-refined rather than pilot-processed or commercially processed, which means it's automatically going to have a higher oxidative stability. Secondly, most of it was from frozen seeds, so it wasn't mature seed that had the same chemistry as what was in the examples. And third, it was measured by a different method that you couldn't equate. I understand what you're saying. So what you're saying is, as a matter of fact, Dr. DePonte could have been perfectly sound in thinking that this was not material. But that doesn't go to the question of whether if the district were viewed differently, that wouldn't be a something additional beyond just withholding. If there was some affirmative representation, there was strikingly different results. Am I correct about that? That was a representation that was, yes, that was affirmative representation, and it was correct. So the only other way that the undisclosed material could be relevant, the undisclosed information, I shouldn't use the word material. The only other way it could be relevant is if you look at the purpose of the comparison between 129 and 130 during the prosecution. Those examples were in the application as filed, so they weren't presented subsequently in response to the rejection. But the rejection was in view of a prior art reference to Wong. And the examiner's reasoning was the claimed oil is inherent in Wong, even though Wong doesn't disclose the oxidative stability, because Wong has the same fatty acid profile. And the examiner said, fatty acid profile automatically gives you the oxidative stability. And the response to that was, that's not correct. You can't predict oxidative stability for fatty acid profile, as shown by IMC 129 and IMC 130 in our examples in the application. Because they have the same fatty acid profile, but they have strikingly different oxidative stabilities. So then the question is, does the undisclosed material contradict that? Is it inconsistent with that? Well, no, it's not. In fact, it doesn't really add anything, because it's already apparent from the examples that Wong's oil could have the same oxidative stability, or it might not. It might be like IMC 130, or it might be like IMC 129. And you can't tell. The undisclosed information doesn't give you any more information about that. It doesn't change the inherency equation, because you can't have inherency unless something necessarily and inevitably happens. There were differences, were there not, between the information that was disclosed with respect to IMC 129 and the information that was withheld? Yes, there were differences. And those differences made the information irrelevant. It's just like the Hoffman-LaRoche versus Promega case that this court decided, where there were unique conditions for the apparently inconsistent information. And therefore, it was not material, and there was no intent to see it. Well, there may have been different conditions, but the data was different, and the data was contradictory. It was not contradictory. Because it was carried out – because the bench-refining process is less harsh than pilot-clamped or commercial access. I understand what you're saying, but even though the conditions were different, the resulting data was inconsistent with the data presented to the patent office. No, Your Honor. For example, if you took IMC 130 oil and you bench-refined it instead of commercial or pilot clamped, it would have a far higher oxidative stability. You have to compare apples to apples, because the processing changes the composition. So the experimental – Just looking at the data, the end results, that data was inconsistent, correct? I cannot agree with that, Your Honor, because it's a different composition. So the 129 that resulted from the bench-refining in the undisclosed information is not the same composition as the IMC 129 in the patent examples. They're two different compositions. So to say that one has an oxidative stability of A and another has an oxidative stability of B and those are consistent or inconsistent doesn't make sense, because you're talking about two different compositions, even though they're both labeled IMC 129. Can I ask a question? Pardon? You're applying, right? You're applying to one called the same thing, IMC 129, in both instances, right? Right, because they come from C that's called IMC 129, but the processing dictates the composition. Composition changes with processing. And Dr. DeBonte thought the only thing that was relevant was an apples-to-apples comparison. Those are the only things that are presented in the patent. The patent doesn't compare pilot plant to commercially processed. It either compares pilot plant to pilot plant or commercially processed to commercially processed. In fact, there's evidence in the record, appendix 2263, 2314, and 3606, where you can see the same oil processed in three different ways. And in every case, and in fact, it's IMC 129 processed three different ways. And the pilot plant is always the lowest oxidative stability. That is the commercially processed. And that is the bench refined process, which has the highest oxidative stability. They're the same composition. So are you arguing the materiality problem now? You started off with intent to deceive, or are you using the lack of materiality to influence our intent to deceive analysis? Well, as I said, the court was clearly erroneous on both fronts. But even if you think it was material, even if you think it was highly material, there still has to be separate evidence of intent to deceive. And if Dr. DeBonte had plausible reasons for believing that this was irrelevant, which he did, then there can't be any inequitable context. Hold on. Let me just make sure I understand. Is the standard you're proposing that an applicant who has any plausible reason for thinking information is not going to hurt compatibility, that that's enough for a unilateral decision to withhold information? I might have misheard you, but I thought that's what I just heard you say. You know, obviously, inequitable context is very fact-dependent. So it depends on the facts of each case. I think in this case, that is certainly true. Doesn't that fly right in the face, though, of the DeBonte case that your opponents rely on so heavily? Where it says, look, where there's a question, even in close cases especially, you have to err on the side of exclusion. I mean, I thought that was axiomatic, which makes me wonder about your assertion that any plausible reason for thinking it might not affect compatibility would be enough to withhold. Well, when you're talking about intent to deceive, if an applicant had a plausible reason for believing information was immaterial, then there was no intent to deceive. LeBonte was a different situation. LeBonte, the question was whether or not experimental negation applied to an on-sale bar. And in fact, the court said that it was not experimental. It was clearly immaterial, and it did have to be disclosed. Here, you've got a scientific question. Is this an apples-to-apples comparison that is relevant? Or is it an apples-to-orange comparison, which in fact it is? It's irrelevant. Who should make that decision? Should the applicant unilaterally say, well, I don't think it's really that big a deal, so I'm not telling. Or should the applicant tell the examiner so the examiner can make a judgment about whether it's a big deal? In the first instance, in the real world, the applicant has to make the decision. Or the patent office is going to be inundated because a person will sit down and say, well, if I ever get into litigation, can my opponent come up with some sort of reason that this thing arguably is apparently inconsistent? And if so, I better say it to the patent office, and the patent office will be inundated with information. A judgment has to be made whether something is material, and Rule 56 basically requires that. I understand your hypothetical, but look at it in the reverse, which is are we saying that every applicant has a right to say, I'm not going to disclose it because I have a plausible reason why it's not relevant or material, and therefore I don't have to disclose it because I think I have reason to explain it away to the examiner? Wouldn't that skew the process? Well, I don't think that's going to happen because people don't want to be caught in this type of situation where a patent has been held valid and infringed, and there's going to be a risk of unenforceability. If they had to do it over again, I'm sure they wouldn't disclose this. But the fact is— But that's the rule you're asking us for. You're asking us to say there's no inequitable conduct here because even though the material is highly relevant, if the applicant comes in and says he could have explained it wrong, that, well, he had a rationale that he could have given the examiner as to how he could explain it away, then he's off the hook, even though he intentionally did not give it to the examiner. Your Honor, that is what this court has done. If you look at Warner-Lambert v. Theda Pharmaceuticals, that was a case where it was highly material, and the court reversed because the inventors explained that they didn't believe it was material, and they had plausible justification. So the court has done that. It did that in Halliburton v. Schlumberger, although there they said it was not material, and that also there was no intent to deceive. Most recently in Kenan Foods v. Pigmentos Vegetalis, the court considered the non-obvious and debatable explanations of the inventors and held that there was no inequitable conduct. That case was decided after the briefs were in in this case. And even in the Monsanto v. Beyer case— Are all those cases—do you recall if those cases were our affirming magistrate court judges? No, some of them reversed. The Hoffman v. LaRoche v. Promega itself reverses, and reverses the district court judge who felt it was material and there was intent to deceive. I see I'm in my rebuttal time, or maybe I'm even beyond it. You're beyond the rebuttal time. Your Honor, I have a question, just if I may briefly. In your view, does the reasonable examiner standard have any vitality about that? In my view, it should not for the reasons in my brief. But this court has said that it is still the proper standard. I think it is not. And I've got set forth in my brief. But even under that standard, I feel there's no intent to deceive here or materiality in that matter. Our questions have run out of time, so we'll restore your rebuttal. Thank you. I take the floor, Mr. Wilcox. Thank you very much, Your Honor. Harry Wilcox for Governor Block for the Chamber of Booths and the Ballet of Sciences. Wilcox, and before you get into your argument, let me ask you about your cross-appeal. You questioned the claim construction. Yes. Is that a proper cross-appeal, or is that simply another basis for affirmance? No, I think it's a proper cross-appeal. I know they challenge the jurisdictional aspect, but I think clearly this court's law is that interlocutory order is emergent with the final judgment. And so, jurisdictionally, it's proper. And on the cross-appeal- But you did indicate that if we affirm on the appeal that the cross-appeal is moot. That's correct. But never looked. That's correct. So is the cross-appeal simply another ground for affirmance, an alternative basis for affirmance? Or is your concern that if we don't affirm and it goes back, then you'll have a claim construction you don't agree with? Well, I think we have a claim construction ruling. It's been decided. The case is now before this court. And so I think that this court can correctly reduce those decisions in the district court when we're on appeal. So I think that, in other words, we are, indeed, trying to, you might say, diminish the rights of our bill in this case by asking for a more narrow claim construction. And I'm a question- Does this conflict with Bailey versus- Yes. All right. I think it does. And I think in particular because the claim construction doesn't really go so much to the on sale or the inequitable conduct. But that's kind of a very separate issue. All right. I'm going to try to confine my comments to the inequitable conduct issue also. And I think the rest of the issues are, indeed, addressed in the briefs. But, first of all, it's true that the entire issue during the prosecution of these patent applications was whether the oil called IMC 130 had, as they argued, a strikingly better oxidative stability than another oil with the same fatty acid profile. Now, Mr. Sokol argues that the withheld data is really not inconsistent because the withheld data is generated under different conditions and therefore is the sort of apples and oranges. Okay. What's your reaction? Well, let me get directly to that. First of all, let me answer a question that you asked, Mr. Sokol. Yes, the data on its face is clearly inconsistent. For example, the AOM value for IMC 129, which was what was withheld, is 35. The best they gave the patent office was 30. And so, obviously, in the context of the argument they were making that 35 is inconsistent and it's actual data that's inconsistent. So let's assume that it's highly material. I think the real rub here on the intent to deceive is that the district court concluded that it's highly likely that he omitted the information because he concluded it could be explained away. So the district court has a finding that the motivation to not provide this information was benign. It wasn't an intent to deceive the PTO, but rather it was benign because he didn't think he would deceive the PTO because he thought it could be explained away anyway. How do you get around that argument? Well, I think, first of all, I don't think it's fair to say that he found it was benign at all because he said specifically that they unilaterally withheld it. They took steps, he says, to make sure that they never- He, meaning the district court judge? Yes. Okay. That they took steps, they deliberately took steps to make sure that they did not occur in the patent office. That's not benign. But as to motivation, where he says the motivation of the cardiopsychiatrist was, he says it's highly likely that he omitted the information. I read that as that he was motivated, there was motivation in his rationale for omitting the information because he concluded it could be explained away. Doesn't that dispose of whether or not his motivation was or was not to deceive the PTO? No, I think it does not because I think, generally speaking, in every case, somehow the patent applicant's got an idea in his head that he's entitled to a patent. But you can't say that just because he thinks he's entitled to a patent on his invention that that allows him then to withhold highly relevant information from the United States Patent Office. That would basically prevent any information getting to the patent office because most patent applicants believe they have a valid patent. Yeah, is it relevant just to when the inventor might have come to that conclusion that he could explain it away? In other words, if the inventor at the time of all of this experimentation either had made some notes or made some comments or there was some contemporaneous evidence indicating that, well, this data doesn't really help us, and then there's different data that ultimately results in a patent application. There's a contemporary showing that the inventor didn't think this was germane as opposed to a conclusion reached 14 years later in the midst of litigation that all I can think of as to why it didn't dispose of it is because it really was different or it can be explained away. I think there is an important difference, and I think the district court does get to that because he says that a post hoc excuse, either one that you think of during litigation but you didn't think of at the time, can never officiate materiality. And he says in the final balancing, one might look finally at this excuse even though it's post hoc, and maybe in some cases that might lead to the conclusion that you shouldn't hold the patent that was inequitably procured. But he says, I've looked at that issue, and I don't find that argument persuasive. So he looked at those excuses from that viewpoint and found that they were not persuasive. Can you address the argument made by your opponents that the district court just started off with the wrong standard, that the debatable, not debatable standard is in and of itself a problem because the district court started from that point and that's the wrong point? I think that has to be the standard. And in this court's decisions in Brasler and Labonte and GFI, I think those decisions make clear that that can't be the standard. Brasler says moreover that that can't be the standard. The idea, in other words, the standard has to be that if the information is uncertain, or to use the district court's words, if it is not, if the excuse is not obvious or beyond debate, then you have to disclose it. Brasler says that, and Labonte says that, and GFI says that. What is the practical concern raised by Cargill that somehow throws open the doors to a flood of information, questionable value? I think that it doesn't open the floodgates. You've got specific cases. Scientists have whatever data they have. They have this material data. They should present it to the patent office, and let the patent office resolve the debate. They shouldn't, as Cargill did here, as the district court found, take steps to ensure that the debate never occurred. That's what they did, and that's what the defendant did. If I can, I'd like to come back to the issue of the Apples comparison. You asked that question. I didn't quite get to that before, because I think there's some really simple way to look at this. If you're going to talk about an Apples-to-Apples comparison, then I think we have to start by defining what an Apple is. An Apple, in any patent case, is something that is defined by the claim. Now, in this claim, which is at A328, the only limitations in the claim are the fatty acid profile and the AOM value. That's it. So the question throughout the entire prosecution was, does an oil with that fatty acid profile necessarily have the AOM value? But that's it. So you look at fatty acid profile of the oil. So it doesn't matter how it was processed, as long as it's got that fatty acid profile. And the IFC-129, no matter how it was processed, no matter whether it was frost damaged or had excess chlorophyll or whatever, it had that fatty acid profile. And the question is, does an oil with that fatty acid profile have the AOM value? Well, let's take the data point that they withheld of 35. So it has an AOM of 35. It has the fatty acid profile required by the claim. It has the AOM required by the claim. That's what they withheld. Right squarely within the scope of the claim. So that's an Apple. And they withheld it. In your response to the assertion that this is so different as to be a different composition because of the different processing, is what? The composition is defined by the fatty acid profile. That's what defines the composition of an oil. An oil is made up of fatty acids. So the fatty acid profile is the thing that fundamentally defines the composition, and certainly for purposes of this claim, it does. I want to make one point also on that, one further point. Because they say in their reply brief that the claim was construed by the district court to require a particular method for determining AOM. Specifically, they argued the method of the AOCS, and it's called CE 12-57. And they say the district court construed the claims to require that that method be used. That's absolutely incorrect. The issue was addressed in the district court during claim construction, and the court concluded exactly the opposite. That you shouldn't, the claim shouldn't be limited to that method. And their argument is that pages 12 and 13 of the reply brief. And it was argued, and it's in the trial, it's not in the appendix. This issue didn't come up in the reply brief, but it's in the trial transcript at page 1600 to 1601. And in addition, not only was it decided there, but while the jury was out, the jury came in and they asked a question about that. They said, should we construe this AOM language of the claim to require testing by this particular method? The court said, no. He said, I'm not telling you that. Because that's how he ruled. He said, that's up to you to decide on the facts. And that's in the trial transcript. It's 1794, line 16 to 18. So at that point, they're absolutely, that's just incorrect as a basic statement. And I want to get that out because it's in the reply brief. And there's another thing I might also just mention in that connection. That in their, this is supposed to be on sale, but I just want to make it that they, in terms of experimentation that P&G was supposedly doing, you know, that was all done for P&G's own use. And they had no control over it or the like. But they quote, they say that some of the testing that was being done at P&G was done by a man named Tim Mounce. That's not correct. Is that in the reply brief? That's in the reply brief. It's page 29 of the reply brief. They argue that Tim Mounce was conducting tests for P&G. That's not correct. Tim Mounce did not work for P&G. He worked for an entirely different company. So I just wanted to make that point. But if I come back to the apples to apples, in the reasons for allowance in this case, the examiner said IMC 129, which is one of the parent lines used to produce the instant oil, reads on the fatty acid content, but as shown in the examples, does not display the required oxidative stability. So the examiner is saying IMC 129 has got the fatty acid content, but it doesn't have the oxidative stability. If they had given them the data, the examiner would have seen, yes, IMC 129 has the fatty acid content, and it's also got the oxidative stability, IB35, which is in the claim. That's the lower end of the claim. So it would have met the claim. So consequently, I think this apples to apples comparison is absolutely meaningless. I think there are other reasons that I could go through, but they're all discussed in the brief, and I see that my time is just about up. And I think that I would reserve a little time just in case, depending on what counsel says. Well, of course, you really haven't gotten into your cross-appeal. Well, that's true. We have not. We have not. You have 13 seconds to get into it. Okay. I think that I would just like to point out that in going through the intent argument, I think it's important to focus on two things. There's a lot of things in there on intent, but on A5, the district court says, in general, it is an intent to deceive or mislead the PTO. In this case, it is the intent to get the examiner to approve the patent while deliberately withholding information that could cause her to decide otherwise. And then on A6, he says— But it's information deliberately withheld with an explanation as to why. And under Brasler and Labonte and GFI, that says you've got to give them the data along with the explanation and let the patent officer decide. And the court goes on on the next page, A6, to decide that the vague findings of intent was met. Thank you. Thank you, Mr. Roper. Mr. Sokol or both. Okay. Let me try to address the disputing points again. The court effectively applied a strict liability standard on intent. The court basically said, with the quotes I read and still other quotes, I don't care that I do believe you if your explanations are debatable and not obvious, then you have to give the information to the patent office or you're guilty of inequitable conduct. Now, the defendants themselves admitted that, in their answer to the complaint, that processing changes the oxidative stability. And that's the appendix at 2501. Oh, the apples to apples comparison. You have to bear in mind that the undisclosed material is not prior art, so the fact that it may have the same fatty acid profile doesn't make it relevant. It's relevant if it is inconsistent with anything that was presented to the patent office, not because it's prior art itself, because it's not prior art. It was experimental internal work done in little tiny quantities. It was never published. So if it's inconsistent, if it doesn't show that I am – if it contradicts that IMC 130 is better than IMC 129, then it would be relevant. But it doesn't contradict it because it's not an apples to apples comparison. It's processed by bench refining, which automatically gives you a higher oxidative stability. But you're not disagreeing with what the record reveals, which is that the ultimate – the figures that came out, whether it was bench refining or some other method, was within the range defined by the patent claim, right? Your assertion is that the processing made it so different that it just shouldn't have been looked at. Yes. But you're not arguing, are you, that the record is other than what your opponents asserted is that that bench refined oil landed the results within the claim? Yes, that's correct, and it's irrelevant because it's not prior art. So it has to be inconsistent with something that was presented to the patent office. Now, as to when he believed this, the court said he believed it at the time because he thought it would be explained away and that if the examiner didn't believe his explanations had he presented them, the examiner would have made a huge mistake. But there's contemporaneous documents in the record that show exactly the reasons that he gave in his testimony at trial. Where would we find them? Okay, in the appendix at 2263 through 64, it says, the fatty acid profile alone does not determine oxidative stability. I'm sorry, that was the examiner's reason for – no, I'm sorry, that's correct. The examiner's reason for allowance is 3432 in the appendix, and that exact statement appears in a contemporaneous document at 2263 through 64, and there's lots of corroboration in contemporaneous documents that the values given to the patent office for IMC 129 and IMC 130 were the correct values. In the appendix at 2257, 2263, 2539, 2629, 3036, the same values that were given to the patent office. This experimental data was simply not comparable, and it was not relevant. There's no evidence that Dr. DeBattey believed that that evidence was relevant. What about the data at 2285? That's the data that was not produced. Right, that's the data that was not produced, and as you can see, it talks about high chlorophyll. This is bench-refined chemistry and performance. It does talk about ALM data. Yeah, but it says auto-oxidative stability based on ALM hours, and that's explained in the testimony that the other test, OSI I think it's called, is an automated test, which is why they switched to it, because it's just easier to do. But in their contracts, they use the CD1257 method, which I assume the time is up. In their contracts, when they're actually selling this material, they use the old method, and there is no exact correlation. Dr. Frankl, the expert for the other side, who's an oil chemistry expert, said there's no scientific correlation to take you from one to the other, and it's just not acceptable to do that. This is a quote from the district court, and I need to tell you whether this is enough or not. The issue is whether he, Dr. Blunt, intended to deceive the PTO about the actual state of the evidence relevant to that application. That's on page 4 of this report. Is it accurate that if this report concluded he did intend to deceive the PTO about the actual state of the evidence relevant to the application, that that would, in your view, not be enough to constitute intent leading to a point of inevitable conflict? No, I don't think it would be enough, although he certainly didn't have that. I think you have to intend to deceive in order to get it packed, not just about the state of the art. But he didn't intend to deceive about the state of the art. This undisclosed material was not prior art at all, as I said. Thank you, Mr. Sobel. Thank you, Mr. Roper. Case is submitted.